[No. D055018. Fourth Dist., Div. One. Nov. 2, 2010.]

MEPCO SERVICES, INC., Plaintiff, Cross-defendant and Respondent, v.
SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT, Defendant,
Cross-complainant and Appellant;
HARTFORD FIRE INSURANCE COMPANY, Cross-defendant and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of part III.A. through E.

1028

[redacted]

**COUNSEL**

Bergman & Dacey, Gregory M. Bergman, Mark W. Waterman and Arash Beral for Defendant, Cross-complainant and Appellant.

Carno & Carlton, Anna M. Carno and Andrew C. Carlton for Plaintiff, Cross-defendant and Respondent and for Cross-defendant and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Defendant and cross-complainant Saddleback Valley Unified School District (Saddleback) appeals from a judgment entered in favor of plaintiff and cross-defendant Mepco Services, Inc. (Mepco), a general contractor, and cross-defendant Hartford Fire Insurance Company (Hartford). This case arose

from a dispute between Mepco and Saddleback regarding a school modernization project. Mepco bid on the project based on plans provided by an architectural firm that Saddleback had hired, and was eventually awarded the $1.64 million contract. During construction, Mepco encountered a number of problems that required that it request approval for additional work that it had not originally contemplated based on the plans. Mepco performed the additional work after being directed to do so by representatives of Saddleback. After Mepco completed the additional work, Mepco and Saddleback disagreed as to whether Mepco was entitled to be paid for the work, and whether Mepco was entitled to an extension of time to complete the contract, or instead, would be liable for liquidated damages as a result of the delay.

When Mepco and Saddleback were unable to resolve their disagreements, Mepco sued Saddleback for breach of contract, among other things. Saddleback countersued, claiming that Mepco had breached the parties' contract, and sought liquidated damages for Mepco's delay in completing the project. Saddleback also sued Hartford pursuant to a performance bond that Mepco had obtained from Hartford, at Saddleback's request, as required by the terms of the contract between Mepco and Saddleback.

After a trial that lasted nearly two weeks, a jury determined that Mepco had fulfilled its obligations under the contract and that Saddleback had materially breached the contract. The jury concluded that Mepco was entitled to recover from Saddleback damages that included a retention payment and a final progress payment that Saddleback had withheld, as well as damages for all of the additional work that Mepco had completed on the project that was outside the scope of the original plans. The jury also determined that Mepco was entitled to recover delay costs.

The trial court entered judgment in favor of Mepco in the amount of $681,086.55, plus $189,479.89 in prejudgment interest, $366,916.63 in attorney fees, and $208,650.26 in costs on its complaint against Saddleback. The trial court also entered judgment against Saddleback on its cross-complaint against Mepco and Hartford.

Saddleback appeals from the judgment, raising numerous claims of error. Saddleback contends that the trial court erred in (1) allowing Mepco to elicit testimony about its president's financial condition, thereby appealing to the sympathies of the jury; (2) allowing Mepco to recover damages for breach of contract, in the absence of an express written agreement, signed by the

Saddleback board, concerning the work at issue; (3) permitting Mepco to introduce evidence of settlement negotiations between the parties; (4) refusing to allow Saddleback to present all of its theories to the jury, including a mitigation of damages defense, an offset/credit defense, and an apportionment of liability defense; (5) demonstrating bias against Saddleback in the presence of the jury and permitting Mepco to argue to the jury that Saddleback had destroyed evidence; and (6) awarding attorney fees to Mepco.

We conclude that the trial court erred in permitting Mepco to elicit certain testimony from the president of Mepco to the effect that he had to refinance his home and use his personal credit to pay the subcontractors, and in admitting in evidence a letter that Saddleback sent to Mepco after Mepco had filed suit in which Saddleback agreed that it would pay Mepco for some of the work that Mepco claimed was beyond the scope of the original plans. While we are troubled by the improper admission of Mepco's president's testimony regarding the financial impact that this dispute had on him and the letter that Saddleback sent to Mepco after the lawsuit had been initiated, after having thoroughly reviewed the trial record, we conclude that neither of these errors affected the outcome of the trial. It is not reasonably probable that if this evidence had not been admitted, the jury would have returned a verdict more favorable to Saddleback since the record is replete with direct evidence—much of it from Saddleback's own witnesses—that Saddleback breached its contract with Mepco, and that it was liable for the damages that Mepco claimed.

We find no merit to Saddleback's other claims of error, and therefore affirm the judgment of the trial court.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

On June 28, 2006, Saddleback awarded Mepco a contract (the Contract) to complete a project known as the "Esperanza Modernization & Relocation of Two Portable Buildings" (the Project).[1] The Project involved the modernization and improvement of a special needs school located in Mission Viejo,

---

[1] Mepco was the second lowest bidder on the Project, but was awarded the Contract after the company that submitted the lowest bid withdrew its bid.

California. Under the Contract, Mepco was to perform construction work (including providing labor, materials, and equipment) in exchange for payment in the amount of $1.64 million. The Contract called for the Project to be completed within 90 days, and included a liquidated damages provision in favor of Saddleback that set liquidated damages at $1,000 per day if the work was not completed within the time specified in the Contract.

Saddleback contracted with a project management consulting firm called TELACU to oversee construction of the Project. Saddleback also hired MVE Institutional (MVE) as the architectural firm for the Project.

Construction began on or around July 10, 2006. Shortly after beginning construction, Mepco encountered a number of unforeseen conditions and problems with the plans and specifications that the Project's architect had provided. Mepco sent a number of requests for information and change order requests to the Project's architect and superintendent through the "Buzzsaw" computer system—a system that Saddleback had purchased for use in organizing its construction projects.[2] The Buzzsaw system allowed all of the Project participants to upload documents (including daily reports, requests for information, change order requests, and other forms) into one central depository, so that all parties could review the documents and address any questions, concerns, or requests raised by the documents. Elie Abinader, Mepco's president, explained, "[W]e were supposed to have all communication through Buzzsaw."

In addition to encountering unforeseen conditions at the site, Mepco belatedly discovered that certain aspects of the Project plans that Mepco had relied upon in bidding on the Project required approvals or permits from various governmental agencies, and that these approvals and permits had not been obtained before construction began. For example, the plans had not been approved by the Division of the State Architect (DSA), which had to review and approve the entire set of plans to ensure that they met state safety requirements; the county health department, whose approval was required for the specialized kitchen areas; the City of Mission Viejo, which is the entity that would issue a permit for a fire line hot tap connection; or the Orange County Fire Authority, whose approval was required for a fire lane. Before these agencies would issue the necessary approvals and/or permits, the plans had to be altered in a number of ways.

Abinader testified in detail about the problems that Mepco encountered in completing the Project. According to Abinader, Saddleback representatives on

---

[2] It appears that Mepco input 98 requests for information and more than 40 change order requests into the Buzzsaw system.

the Project, including the architect, were slow to respond to Mepco's questions about the plans. In addition, Saddleback representatives asked Mepco to perform additional work on the Project—work that was not contemplated in the original plans—after the 90-day completion date. With respect to each change order request that Mepco had input into the Buzzsaw system, Abinader testified as to why the work had been necessary, how the plans failed to account for the additional work, the cost that Mepco proposed for the extra work, and whether Saddleback representatives had authorized Mepco to complete the work pursuant to that proposed valuation method.[3]

Abinader testified as to how the parties undertook change order work under the Contract. Proposed change order work included work that Mepco did not believe was contemplated within the original plans and specifications drawn by the architect but that was necessary in order to properly complete the Project, as well as extra work that Saddleback had specifically ordered during construction.

When Mepco would encounter unforeseen conditions that required additional work or when the architect would request that Mepco perform additional work, Mepco would submit a change order request to Saddleback representatives. Mepco would transmit the change order request to Saddleback by uploading the document into the Buzzsaw system. The architect would receive Mepco's change order request through the Buzzsaw system, and would respond as to whether he was authorizing Mepco to complete the work and, if so, on which payment basis (i.e., on a lump-sum payment basis, a time and materials basis, or a unit price basis), if he believed the work was necessary

---

[3] The Contract identified three possible ways that proposed additional work could be valued. The Contract states, "Value of any such extra work, change, or deduction shall be determined at the discretion of DISTRICT in one or more of the following ways: [¶] (1) [b]y mutual written acceptance of a lump sum proposal from CONTRACTOR properly itemized and supported by sufficient substantiating data to permit evaluation by DISTRICT and ARCHITECT. [¶] (2) [b]y unit prices contained in CONTRACTOR's original bid . . . or fixed by subsequent agreement between DISTRICT and CONTRACTOR. [¶] [3] [b]y cost of material and labor and percentage for overhead and profit ('time and material')."

The distinction between the documentation necessary to support a lump-sum proposal as opposed to a "time and material" proposal became relevant to the parties' dispute over payment for the additional work. The witnesses who worked on the Project testified that in implementing this Contract provision, Mepco would propose the additional work in a change order request, and would include a proposal for the cost of the work as either a lump sum or a time and material basis. If a Saddleback representative was going to authorize Mepco to perform the work, that representative would inform Mepco whether the work was to be done pursuant to the lump-sum proposal or on a time and material basis. Under the lump-sum method, Mepco would not have to provide as much documentation or as detailed records of the hours worked by its employees as would be required if the work were authorized to go forward on a time and material basis.

and not within the scope of the Contract. Alternatively, the architect would reject Mepco's request if he believed that the proposed work *was* within the scope of the Contract.

Abinader testified that Saddleback "told us, since day one, that the architect represent[s] the District. He's the one who approve[s] the proposed change order[s]." According to Abinader, the architect would frequently verbally instruct Abinader to proceed with the work, and would tell Abinader that he would "get [his] paperwork later on," such as at the weekly construction meetings, because "that is where everybody is already around the same table."

Abinader explained that the parties believed that under the Contract, Saddleback's superintendent "need[ed] to sign them [the change order requests] up to 10 percent [of the Contract price]," so the architect and project manager would "start accumulating those change order requests or proposals, because it goes—instead of bringing every change order request to the District for signature on the change order . . . we bring [a number] of them together, and the District will put the cover sheet, which is the change order we saw before, and they call it change order now, which will be [a] set of about 5, 6, 7, 10 change order request[s], or it could be one."

Abinader testified that Saddleback representatives would often verbally instruct him to go ahead and perform the change order work under a lump-sum payment method. Abinader said that when he would ask them to give him something in writing, they would tell him that "it's dumb to ask for that."[4] According to Abinader, when he said that he would not perform the work unless he received signed paperwork, the Saddleback representatives told him that if he did not complete the work, he would be in violation of the general conditions of the Contract. Abinader also testified that, with respect to some of the change order work, Mepco had been directed to complete that work by the first project manager on a lump-sum basis, but that the second project manager later told Mepco to perform the same work on a time and material basis. As a result, when Saddleback later demanded that Mepco provide Saddleback with more paperwork to support some of the change order requests, Mepco was unable to do so because it had initially been directed to complete that work on a lump-sum basis, and thus, had retained less documentation pertaining to these change orders.

Abinader testified that Saddleback had not paid Mepco for any of the additional work that Saddleback representatives had directed Mepco to

---

[4] Thomas McKeown, a program manager in the Facilities and Planning Department at Saddleback during the Project, admitted to having forwarded to the architect one of Abinader's e-mails in which Abinader requested written authorization to complete the change order work. In forwarding Abinader's e-mail, McKeown described it as a "dumb letter from Elie."

complete, despite the fact that Mepco had requested payment on a number of occasions. In addition, Saddleback never agreed to grant Mepco any time beyond the 90 days provided in the Contract to complete the project, which meant that Mepco could be liable for liquidated damages.

Saddleback's original project manager on the Project was Dean Clay. Clay acted as project manager from the start of construction in July 2007 until September 2007. Clay was officially employed by J.E.M. Consulting, a company that TELACU hired. Clay had worked on a number of projects for Saddleback in the past.

Clay, a licensed contractor, testified that his duties as project manager were "overseeing the project . . . taking care of change orders that might come through with the subcontractor or the general contractor and . . . seeing that [the contractor is] doing it per the plans." Clay acknowledged that if he gave direction to Mepco on the Project it was the same thing as Saddleback giving direction to Mepco on the Project, and that he had the authority to approve change orders.

According to Clay, Mepco encountered a number of unforeseen conditions while working on the Project that required that Mepco complete additional work that was outside the scope of work identified in the Contract. Clay testified that Mepco was entitled to change orders for this extra work, that Mepco had been directed by Saddleback to perform the work, and that it was his understanding that Mepco was to be paid for this work. Clay personally gave Mepco verbal authorization to perform extra work while out in the field, and would later "talk to the architect and he issues a written directive for [Mepco] to do that work." According to Clay, Mepco was instructed to proceed with change order work on a lump-sum basis for some of the changes and on a time and material basis for other changes.

Clay testified that in his opinion, Saddleback's original architect representative on the Project, Robert Gruspe, was a "pretty weak" architect, in that he "could not make decisions at the job site, and it took him quite a while to get the answers back, and there were several occasions when I had to remind him and kinda push him a little bit that we are waiting too long on some of these answers. Because it was taking him longer than it should be to get some answers back."[5]

In Clay's opinion, during the time that he worked on the Project, Mepco had not caused any delay on the Project; rather, Saddleback had caused delay.

---

[5] Clay later testified that he had informed the architect's firm that he believed the architect was a weak architect, and that he had orally requested that the architect be replaced.

Clay was asked his opinion of the quality of the plans for the Project, to which he replied, "They suck," and explained, "That means I don't like them. There [were] too many open ends that couldn't be—if I can't answer it by looking at the plans in the field as a project manager, and they have to go back to the architect, then they suck."

Clay testified that it is the architect's job "to determine what work is in scope or not in scope on a project." When asked, "[U]ltimately . . . who decides to pay a change order—the Board or the School District," Clay replied that he did not know.

Louis Gallegos replaced Clay as project manager on the Project.[6] Gallegos testified that pursuant to TELACU's contract with Saddleback, TELACU "operate[d] as an owner's representative of the District." Gallegos worked with McKeown during the Project, to oversee construction of the Project. One of Gallegos's responsibilities "was to review those change orders . . . to establish whether they were within the scope of work of the base contract, if they were [a] fair and reasonable price for the work, if there was enough information to evaluate the validity of the change order." Gallegos would confer with the architect and sometimes with Saddleback's program manager and/or the inspector of record for the DSA.

Gallegos testified that pursuant to the Contract, the architect was authorized to determine whether the work completed or to be completed was within, or outside of, the scope of the Contract.

As construction on the Project continued past the original completion date, Abinader began to push harder for written authorization for the numerous proposed change orders that Mepco had submitted. In late February 2007, Abinader sent Gallegos an e-mail "asking him to respond to all proposed change order[s]." In response, Gallegos sent an e-mail to Abinader on February 23, 2007, in which Gallegos stated: "Elie, in response to your e-mail the attached document Mepco Services, Inc., is directed to proceed with change order work in accordance with the contract documents, General Conditions, 59, Change and Extra Work, [i], which clearly states: Disputes over estimate of changes to the contract price and/or contract time. Should the contractor and the District fail to agree on the estimate of any charge or credit to the District and/or additional or reduced time required for proposed changes in the work of any justified delay[,] the contractor, when notified by the District, shall proceed without delay in the changes or extra work and shall pursue the remedies listed under General Conditions Article 57, Disputes. Mepco Services has been directed on several occasions to proceed with

---

[6] Clay apparently left the Project before its completion because TELACU discharged J.E.M. Consulting.

change order work in accordance with contract documents. Please be advised that if Mepco Services, Inc., does not immediately proceed as directed, Mepco Services, Inc., will be in violation of their contract and any and all additional costs and/or associated delays will be . . . the direct[] responsibility of Mepco Services, Inc., the responsible general contractor. If you have any questions, feel free to contact me directly."

Gallegos conceded that in this e-mail, he directed Mepco to proceed with all of the change order work for which Mepco had already received verbal authorization. Gallegos further testified that his understanding of the Contract was that "even if there was a dispute, in terms of time to perform the work, or [a] dispute on the dollar amounts associated with the work, Mepco still had to go forward and do the work."

Later that day, Abinader responded to Gallegos with the following e-mail: "Louis, I have been trying to contact you but you are not returning the calls. Anyway, per our meeting last week you stated that you are going to respond to all change order requests that are in Buzzsaw by Monday, February 19, 2007, even though it is a holiday. Per the General Conditions, you either direct me to proceed based on T and M, or you could direct me to proceed based on a lump sum, or you could simply direct me not to proceed with the change order and therefore cancel the change order. This already happened before in the change order of the dropped ceiling. The choice is yours. Mepco is not declining to work on any change order, but Mepco will be happy to do any change order when instructed to do so. Therefore, per [the] General Condition that you are referring to, please go to Buzzsaw and reply to every single change order request. Until you do, as promised many times, Mepco could not proceed with any change order work that has no response . . . from either the architect or the School District. So far, we have change order requests totaling over $400,000 and no action is being taken from the District part nor from the architect part, who always refers me to contact the . . . School District in this regard."

Gallegos admitted that he recommended that Saddleback approve payment for a number of the change order requests that Mepco had submitted, and that he believed these change orders were legitimate claims for payment. Gallegos also testified that to his knowledge, Saddleback never gave Mepco notice that Saddleback believed Mepco was in violation of the Contract for delaying the project, until October 17, 2007.

Robert Gruspe was the original project manager for the architectural firm MVE. Although Gruspe was not a licensed architect and did not have a certification in drafting architectural plans, he is the person who "developed the plans" for the Project. At MVE, Gruspe worked under the supervision of

Robert Simons, a licensed architect. Gruspe testified that he was the architectural project manager for the Project for approximately six months. Gruspe would conduct weekly meetings concerning the Project. Attendees at the weekly meetings included a Mepco representative, a Saddleback representative, the inspector of record for the DSA, and, sometimes, the school's principal.

Gruspe testified that during the time he worked on the Project, he did not receive Mepco's backup documentation for much of the proposed change order work. As to proposed change order work for which he did receive backup documentation, the documentation was incomplete. However, when presented with labor reports that Mepco had provided in association with change order requests, Gruspe admitted that a number of the labor reports appeared to be sufficient, and he could not recall any particular change order request for which the supporting documentation had been insufficient.

Gruspe testified that he personally developed the plans for the Project, and stated that he did not know whether Mepco had been provided with a set of plans that had been approved by the DSA before construction began. After being asked on cross-examination to review multiple documents, Gruspe had to admit that he had not received a DSA-approved set of plans as of August 10, 2006—a month into construction. Gruspe also acknowledged the authenticity of an e-mail that he had sent to Robert Simons, his supervisor, on August 18, 2006, in which he stated that Saddleback was "getting impatient with the design team [(i.e., the architecture team)] because they are not getting the answers in a timely manner."

Christopher Bradley also worked on the Project as an MVE architect. Bradley was a licensed architect. After Gruspe was taken off the Project, Bradley took over primary responsibility for reviewing Mepco's change order requests. At some point during construction,[7] Abinader sent the following e-mail to Bradley: "For the last six to eight weeks, I have been hearing that you are meeting with Tom [McKeown] to go over the change orders. [Gallegos], two weeks ago, he promised that he will send us a directive to proceed with all change order[s] based on T and M, or based on us approving a lump-sum amount. During that weekly meeting, you stated that you need back-up. I do not accept this response. All change order requests are in Buzzsaw with all attachment[s]. These change order requests give the architect the choice to select[] one of the five options, whether to reject the change order[] or to proceed with it, based on approved lump sum or T & M. Some of these change orders go back three months ago. I will not wait any longer. I need you to respond to all these change orders by next Monday, or I will stop

---

[7] The transcript does not reflect the date of this communication, and the trial exhibit to which Abinader refers in his testimony is not included in the record on appeal.

working on them. Mepco also has responsibility towards other project[s]. This project that was scheduled to [be] completed in three months is now taking six month[s], maybe more. I need answers on all remaining problems on this project and answers on all C.O.R. by next Monday. Please bring in the electrical engineer along with the engineer for the fire alarm system in order to resolve the problems. Again, Monday, not later. I will not be responsible for any additional delays. I have to start another project on December 15. Please give us some times in order to complete this project."

Bradley responded, "Elie, I just went back into Buzzsaw and looked at the attached ones again. Unless there is an issue with Buzzsaw, you are still missing your back-up which is all your certified payroll for the days appearing in the C.O.R., and your material invoices. These are things that we have been asking for, for the last six to eight weeks. We cannot proceed with the C.O.R.'s until we have this information. If you are having problem[s] posting the[] items in Buzzsaw, please contract Jennifer Gallagos at the District. And send the hard copy to my office." Abinader testified that he had submitted this documentation on more than one occasion in hard copy format.

Bradley agreed that Mepco was entitled to be paid for at least some of the change orders. Bradley also admitted that he had signed a number of change orders in 2006 and early 2007.

Thomas McKeown's job as program manager in the Facilities and Planning Department at Saddleback was "to get with the schools and with architects and engineers and ultimately with contractors to . . . execute the projects that came under this bond funding [for improvements to all of the schools in the district]."

McKeown testified that there were some change orders that Saddleback "had agreed . . . were legitimate change orders." According to McKeown, "change order work always occurs in construction projects," and was contemplated in the Contract. Clay and Gallegos, as project managers for the district, had a "[c]ertain amount of leeway" or authority to direct change order work.

According to McKeown, "In the normal course of events, in construction projects, the relationship between the owner and the contractor very often results in that contractor proceeding on verbal authorization . . . [and the contractor] assuming that there will be paperwork follow-up [to provide written authorization] for that change order work [at a later time]." "In the ordinary course of things, the paperwork always lags behind," such that the contractor is directed to proceed with the work, performs the work, and "then the change order document that the contractor prepares is signed and paid by the District."

McKeown conceded that, "[T]here were some—some change orders that we had agreed upon that would eventually have turned into paperwork," and Mepco should have been paid for that work "once the paperwork was complete." McKeown testified that it is not necessarily out of the ordinary for the change order process to take nearly a year to be completed, because "[a] lot of times it's getting the paperwork processed amongst the three or four people who all have to see it and agree to it and process it, and finally get it into the chain to get it done." Thus, in the normal course of business, a contractor is often given verbal approval or rejection of a change order request.

McKeown added that if Mepco "presented a lump sum [change order proposal] at the very beginning, and we agreed to that, whether verbally or in writing, then [Mepco] should be paid for it." According to McKeown, the decisionmaking with respect to the change orders was "a team combination." He testified that "[t]he architect, the project manager and sometimes the inspector all have input [in]to those decisions. Primarily the architect, however."

It was McKeown's understanding that the only time change order requests would have to be approved by the Board was if the cost of the potential change orders was going to exceed 10 percent of the original contract price.

McKeown, Gruspe, and Bradley all admitted that the architect had issued bulletins[8] for new or additional work after the contemplated completion date for the Project.[9]

Gruspe and McKeown both testified that they did not receive sufficient backup documentation to support payment on some of Mepco's change order work. However, Gruspe acknowledged that there were a number of unforeseen conditions that Mepco encountered upon demolition of the original structures and while performing construction pursuant to the plans that required additional work that was not included in the scope of the original Project plans.

Veselin Ninov, the inspector for the DSA (also referred to as the inspector of record (IOR)), testified that there were a number of issues as to which the failure of Saddleback representatives—particularly the representative of the

---

[8] The architect would issue "bulletins" through Buzzsaw to request that Mepco undertake additional work not contemplated by the plans. Mepco would then provide a change order request for that additional work.

[9] The significance of the timing of the bulletins is that it would have been impossible for Mepco to have completed the work requested in the late-issued bulletins within the original 90-day timeframe.

architect—to respond to requests for information (RFI's) or other questions from Mepco, caused construction of the Project to extend beyond the 90-day completion date.[10] It was Ninov's opinion that Gruspe "was lacking decisiveness . . . at certain RFI, certain points of the Project." Ninov also believed that the original plans "were lacking information" and that the quality of the plans was "below average."

Ninov testified that Clay had instructed him not to verify the hours of Mepco's employees with respect to change order work, which meant that there was no independent verification of these hours. However, when Gallegos took over for Clay, Gallegos asked Ninov to begin tracking the hours associated with Mepco's change order work.

Stephen McMahon, assistant superintendent for business services at Saddleback, testified that part of his job was to oversee school modernization projects. McMahon conceded that "[i]f [Mepco] did the work and it's outside the [scope of the] contract, they should be paid." McMahon admitted he had acknowledged in his deposition that a number of the change order requests involved work that was outside the scope of the Contract. McMahon further testified that to determine whether the contractor should be accorded additional time to complete extra work, "the architect and the project manager . . . look at the schedule and . . . say whether time should be allocated or not."

McMahon testified that he believed that, with respect to the delays in the Project, "there is some blame for all parties" involved, and that at least some of the delays were attributable to Saddleback. He also admitted that Mepco "shouldn't be charged liquidated damages for work that Saddleback requested after the original completion date contemplated by the Contract."

McMahon conceded that Mepco had received authorization to proceed on a number of the change order requests. McMahon testified that in his opinion, the plans for the Project "could have been better." He explained, "Well,

---

[10] Ninov testified, "[Y]ou can call [my position as IOR] independent. I am licensed by D.S.A. . . . I was paid by the District, but I . . . report to the architect." Ninov acted as IOR on this Project and on two other projects at the same time. According to Ninov, the role of an IOR is "[t]o inspect and make sure that the project is being built per [DSA] approved plans and specs and code." However, he acknowledged that there was not a DSA-approved set of plans "at the beginning of the project." Ninov testified that it is not "normal to start a public school project without being in possession of the D.S.A. approved set [of plans]," and that he was "required to . . . insist on D.S.A. approved plans."

Saddleback eventually received DSA approval for the plans on May 11, 2007—nearly a year after Mepco submitted its bid on the project based on Saddleback's unapproved plans, and 10 months after construction began. The approval letter from DSA indicated that DSA approval of the plans "as to safety of design and construction" was required "before letting [the term for choosing a contractor from all the bidders and moving forward] any contract for construction."

judging in my opinion, judging from all the requests for information and—and things that have come up that weren't necessarily identified on the plans that [it] sure would have been a lot better if the plans had had all those things in there."

Dean Vlahos, a partner with the architectural firm WWCOT and director of the firm's forensics department, testified as an expert for Mepco. He expressed his view that the plans that Mepco and other contractors were asked to bid on "never should have been released out on the street for purposes of bidding" because there were "far too many errors" and missing components. With respect to the contractor's obligations under the Contract, Vlahos noted that pursuant to the Contract, "the contractor has to continue building" even when there has been a change to the plan as a result of deficiencies in the drawings or other requests from the owner. Further, under the terms of the Contract, if the contractor and Saddleback disagree over costs for change order work, "[t]he contractor is still obligated to continue working on the project. So the district basically has that contractor over the proverbial barrel here to say whether we agree or we don't agree to the money, keep building, and if you get your money, you get your money, if you don't, you don't, is the way that contract is written."

The Project was not completed until early 2007. Throughout construction and even after completion of the Project, the parties continued to discuss whether Saddleback would allow Mepco additional time, which would ensure that Mepco would not have to pay liquidated damages for any delay, and whether Saddleback would pay Mepco for the additional work that Mepco had completed pursuant to the proposed change orders that Mepco had entered into the Buzzsaw system and had been directed to complete. Mepco was requesting approximately $300,000 for work it had performed that Mepco believed was beyond the scope of the original plans, and an additional $160,000 in delay costs. Since the parties were unable to reach agreement on a number of matters with respect to payment and extensions, Saddleback refused to pay Mepco both its final progress payment of $59,633.55, and the $164,000 retention sum that Saddleback had withheld from prior progress payments.

B. *Procedural background*

On June 26, 2007, Mepco filed an action against Saddleback in which it asserted the following causes of action: (1) breach of written contract; (2) work, labor, and services rendered/agreed price; (3) common count for work, labor, and services rendered—reasonable value; (4) breach of implied warranty of plans and specifications, misrepresentation of plans and specifications; and (5) equitable adjustment for delay and disruption.

Saddleback filed an answer to the complaint on September 14, 2007, and at the same time filed a cross-complaint for breach of contract against Mepco,

and breach of the performance bond against Mepco and Hartford, the surety that provided Mepco's performance bond.

The trial court denied Saddleback's motion for judgment on the pleadings and its motion to bifurcate legal issues.

The case went to trial on January 21, 2009. The jury rendered a verdict in favor of Mepco on all issues on February 9, 2009. The jury determined that Mepco was entitled to recover the withheld retention amount and the withheld final progress payment, as well as $154,362 in delay damages, and $303,091 for work performed pursuant to the proposed change orders.

The trial court entered an amended judgment in the amount of $1,446,130.33 in favor of Mepco, on Mepco's complaint, on April 23, 2009. The judgment included $164,000 for the retention amount, $59,633.55 for the final progress payment, $303,091 for the change orders, $154,362 for delay damages, $189,476.89 for prejudgment interest, $366,916.63 for attorney fees, and $208,650.26 for costs. The court also entered judgment against Saddleback on its cross-complaint against Mepco and Hartford.

Saddleback filed a timely notice of appeal on April 24, 2009.

## III.

## DISCUSSION

A.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### F. *The trial court did not err in awarding attorney fees to Mepco*

Saddleback contends that the trial court erred in awarding Mepco attorney fees. After trial, Mepco brought a motion for attorney fees, costs of suit, and prejudgment interest. Mepco cited as the basis for its requests Code of Civil Procedure sections 998, 1021, 1032, and 1033.5, Civil Code sections 1717 and 3287, Public Contract Code section 7107, and the terms of the performance bond that was part of the Project documents. In ruling on Mepco's motion for attorney fees, the trial court stated, "I definitely feel that attorney's fees are valid in this case under—under statute. And also, under the agreement in this case. I think as has been laid out in the papers, when we have the performance bond and the contract[,] [t]he law is clear that they become one.

*See footnote, *ante*, page 1027.

And I—in fact, I even went to the cases and read them word-for-word, and I am satisfied that that is the situation where the contract bond will be read with the contract. And I went through these cases, and I feel comfortable in saying that."

Saddleback maintains that Mepco is not entitled to attorney fees pursuant to Public Contract Code section 7107 or pursuant to the performance bond and Civil Code section 1717.[23] After the parties completed briefing on appeal, this court requested that they submit supplemental briefing addressing the following two questions:

"(1) If the jury had found Mepco Services, Inc. (Mepco) liable for liquidated damages, and the court had entered judgment in favor of Saddleback Valley Unified School District (the District) on its cross-complaint against Mepco and Hartford Fire Ins. Co. (Hartford), such that the cross-defendants were jointly and severally liable for the liquidated damage award (Mepco under the original construction contract, and Hartford under the performance bond), would the District have been entitled to an award of attorney fees pursuant to the provision in the performance bond that requires Mepco and Hartford to pay any reasonable attorney fees that the District incurs 'in connection with enforcement of this bond'?

"(2) If the answer to Question 1 is 'Yes,' which fees incurred by the District in connection with this action would be recoverable under the performance bond?"

The parties were also instructed to "assume [for purposes of answering the first question] that the trial court determined Hartford's liability under the performance bond as a matter of law, subsequent to a jury determination on the liquidated damages question."

After considering both parties' arguments on appeal, including the arguments in the parties' supplemental briefs, we conclude that the trial court

---

[23] Saddleback contends that these are the only two grounds on which Mepco relied in the trial court in requesting attorney fees. Mepco asserts that it also relied on Code of Civil Procedure sections 998, 1021, 1032, and 1033.5. The record demonstrates that Mepco did in fact raise Code of Civil Procedure section 998 as a basis for attorney fees. However, these provisions do not provide an independent basis for awarding attorney fees, but, rather, require the existence of a separate basis for awarding attorney fees pursuant to contract, statute or law. (See, e.g., Code Civ. Proc., § 1033.5, subd. (a)(10).) As a result, Mepco must rely only on its arguments that it is entitled to attorney fees pursuant to Public Contract Code section 7107 and/or the terms of the performance bond, with the reciprocal provision of Civil Code section 1717.

properly determined that it could award Mepco attorney fees pursuant to the terms of the performance bond and Civil Code section 1717.[24]

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs . . . have been satisfied amounts to statutory construction and a question of law. [Citations.] [¶] Stated another way, to determine whether an award of attorney fees is warranted under a contractual attorney fees provision, the reviewing court will examine the applicable statutes and provisions of the contract. Where extrinsic evidence has not been offered to interpret the [contract], and the facts are not in dispute, such review is conducted de novo. [Citation.] Thus, it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo. [Citation.]" (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142 [118 Cal.Rptr.2d 569].)

The Contract does not include an attorney fee provision. However, pursuant to the Contract, Mepco was required to "furnish a surety bond in an amount equal to one hundred percent (100%) of contract price as security for faithful performance of this Agreement . . . ." In satisfaction of this provision, Mepco obtained from Hartford a performance bond for a penal sum equal to the value of the Contract. This particular performance bond, which was part of the Project documents that Saddleback required as part of its bid package, includes an attorney fee provision that states: "Contractor/Principal and Surety agree that if the DISTRICT is required to engage the services of an attorney in connection with the enforcement of this bond, each shall pay DISTRICT's reasonable attorneys' fees and costs incurred, with or without suit, in addition to the above amount."

The effect of this provision is that Mepco and Hartford were jointly and severally liable for any attorney fees that Saddleback might incur in prosecuting an action to enforce the bond.[25]

■ Civil Code section 1717, subdivision (a) provides in pertinent part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs . . . be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing

---

[24] In view of this conclusion, we need not address the question whether attorney fees would have been proper in this case based on Public Contract Code section 7107.

[25] Mepco and Hartford would also be jointly and severally liable for any fees that Saddleback may have incurred in attempting to enforce the bond, even in the absence of litigation.

on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs."[26] "Section 1717 was enacted to establish mutuality of remedy where [a] contractual provision makes recovery of attorney's fees available for only one party [citations] . . . and to prevent oppressive use of one-sided attorney's fees provisions. [Citation.]" (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 128 [158 Cal.Rptr. 1, 599 P.2d 83] (*Reynolds*).)

"Under some circumstances . . . the reciprocity principles of Civil Code section 1717 will be applied in actions involving signatory and nonsignatory parties. [Citation.]" (*Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal.App.4th 375, 380 [30 Cal.Rptr.2d 536] (*Real Property*).) For example, in *Reynolds, supra*, 25 Cal.3d at page 128, the Supreme Court interpreted Civil Code section 1717 to "provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant." Similarly, the reciprocal remedy may be available against a nonsignatory plaintiff seeking to enforce a contract against a signatory defendant if the nonsignatory plaintiff would be entitled to attorney fees if he were to prevail. (*Real Property, supra*, 25 Cal.App.4th at p. 383.)

█ In *Leatherby Insurance Co. v. City of Tustin* (1977) 76 Cal.App.3d 678, 690 [143 Cal.Rptr. 153] (*Leatherby*), the court determined that Civil Code section 1717 could transform a bond's unilateral attorney fee provision benefitting the City of Tustin into a provision that permitted the bond principal and/or bond surety to recover attorney fees in an action on the bond. The provision in the bonds at issue in *Leatherby* provided that " 'in case suit is brought upon this bond by the City [Tustin] or any other person who may bring an action on this bond, a reasonable attorney's fee, to be fixed by the Court, shall be paid by Principal [White] and Surety [Leatherby].' " (*Leatherby, supra*, at p. 690.) The *Leatherby* court determined that the principal or surety could recover attorney fees if "it is the prevailing party" and the action "is an action on the bond." In determining whether the action was one "on the bond," the court referred to the pleadings, from which it could be "readily . . . determined" that the case had been one "based upon the bond." (*Ibid.*)

---

[26] Civil Code section 1717, subdivision (a) also states: "Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to *the entire contract*, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." (Italics added.) Neither party raises an argument about this portion of the statute on appeal. We therefore express no opinion with respect to the potential applicability of this portion of the statute to the issues in this case.

Based on Civil Code section 1717 and the case authorities discussed above, we conclude that Hartford and/or Mepco would be entitled to attorney fees for their defense of Saddleback's claim under the performance bond *if* Saddleback would have been entitled to attorney fees for prosecuting its performance bond claim against Hartford and/or Mepco and if Saddleback had prevailed on that claim.[27]

We must therefore determine whether Saddleback would have been entitled to its attorney fees if it had prevailed on its performance bond claim. Saddleback argues that it "would not have been able to recover attorneys' fees had it prevailed below" because, according to Saddleback, its performance bond claim "was never tried to the jury below." However, whether a party would have been entitled to attorney fees under a contractual attorney fee provision does not depend on whether that party effectively prosecuted its claim under that contract or whether a jury was asked to reach a verdict on the facts underlying that claim. Rather, the pertinent inquiry for purposes of Civil Code section 1717 is whether that party would have been entitled to attorney fees in a hypothetical situation in which that party did prevail on its claim. In arguing that it could not have received attorney fees in this case because the jury was never asked to make findings pertaining to its bond claim, Saddleback is simply asserting that under the particular circumstances of this litigation, *it could not have prevailed* on its claim for breach of the performance bond, *not* that it would not have been entitled to its attorney fees under the attorney fee provision in the performance bond if it *had* prevailed.

Rather than look to the jury's verdict for guidance as to whether Saddleback would have been entitled to its attorney fees, we look to the pleadings to determine whether Saddleback's cross-complaint sought "enforcement of the bond," such that it would have been able to recover its attorney fees under the bond's attorney fee provision. (See *Leatherby, supra*, 76 Cal.App.3d at p. 690 [whether action was "on the bond," thereby triggering attorney fee provision, could be "readily . . . determined" by reference to the pleadings].) We conclude that Saddleback sought to enforce the bond by way of its cross-complaint. It was Saddleback, not Mepco or Hartford, that invoked the bond by raising the bond in its cross-complaint. Saddleback named both Mepco and Hartford as defendants in the cross-action, and specifically alleged a cause of action for breach of the performance bond as to both defendants.

---

[27] Although Saddleback contends that the fee provision in the performance bond cannot be imposed against it because it was not a signatory to the performance bond, Saddleback appears to ultimately concede in its briefing on appeal that the attorney fee shifting provision of Civil Code section 1717 may be imposed on a nonsignatory, third party beneficiary in a situation in which that party would have been entitled to fees if it had prevailed. However, Saddleback contends that in these particular circumstances, it would not have been entitled to fees, and that the fee shifting provision of Civil Code section 1717 therefore should not be applied to hold it responsible for Mepco's attorney fees.

Further, Saddleback specified in its cross-complaint that it was seeking to recover its attorney fees pursuant to the bond.

We conclude that if Saddleback had prevailed on its claim for breach of the performance bond, it would have been entitled to recover the attorney fees that it incurred in prosecuting this action. Therefore, pursuant to Civil Code section 1717 and the cases cited above, Mepco and/or Hartford are entitled to the attorney fees that they incurred in defending against Saddleback's performance bond claim.

Although Mepco and/or Hartford's entitlement to attorney fees incurred in relation to Saddleback's performance bond claim would not necessarily entitle Mepco and/or Hartford to attorney fees related to other claims raised in the case, under the particular circumstances of this case, the attorney fees that Mepco and Hartford incurred in prosecuting Mepco's claims and in defending against Saddleback's claims involved representation on an issue common to Saddleback's performance bond claim. Specifically, by establishing that Mepco had not defaulted under the Contract, Mepco and Hartford defended against both Saddleback's breach of contract claim against Mepco as well as its performance bond claim against Mepco and Hartford.

In order to prevail on its claim to enforce the bond against Mepco and/or Hartford, Saddleback would have had to first establish that Mepco materially breached the Contract, since Hartford's liability as a surety was dependent on Mepco's liability under the Contract. (See Civ. Code, § 2808 ["Where one assumes liability as surety upon a conditional obligation, his liability is commensurate with that of the principal . . . ."]; see also *Pacific Employers Ins. Co. v. City of Berkeley* (1984) 158 Cal.App.3d 145, 151 [204 Cal.Rptr. 387] [" '[T]here can be no obligation on the part of the surety unless there has been a default by the contractor on his contract.' [Citation.]"].)[28] Saddleback concedes this point in its cross-complaint when it alleges, in support of its performance bond claim, that "Hartford is liable to the District on the performance bond . . . to pay [liquidated damages], as well as any and all other damages or losses sustained by the District *by reason of Mepco's breaches of the Esperanza Contract.*" (Italics added.) A finding of liability against Mepco under the Contract was therefore a *prerequisite* to Saddleback being able to prevail on its performance bond claim. It is readily apparent that if Mepco could defend against Saddleback's claim that Mepco was liable to Saddleback for liquidated damages for failing to meet the completion date in the Contract by demonstrating that *Saddleback* materially breached the contract, thereby either excusing Mepco's alleged default, or entitling Mepco to an extension of time, then the same defense was available to Hartford,

---

[28] The fact that Mepco's and Hartford's interests were aligned in this litigation is reflected in their decision to have the same attorneys represent both of them throughout the proceedings.

as Mepco's surety. (See Moelmann et al., The Law of Performance Bonds (2d ed. 2009) pp. 576–589.)

The entire trial in this case was focused on having the jury determine which party had breached the Contract. The jury ultimately determined that it was Saddleback that materially breached the contract and that Mepco had not. These findings meant that Saddleback could not prevail on either of its two claims (i.e., breach of contract and breach of performance bond). Mepco's and Saddleback's breach of contract claims were thus intertwined with Saddleback's performance bond claim. Saddleback had to establish Mepco's liability as a prerequisite to prevailing on a claim on the bond. Therefore, the attorney fees that Saddleback incurred in trying to prove Mepco's breach, and in attempting to overcome Mepco's claims against Saddleback, were, in this case, fees incurred "in connection with" Saddleback's attempt to enforce the bond.

■ Mepco's breach of contract claim against Saddleback, Saddleback's breach of contract claim against Mepco, and Saddleback's performance bond claim against Hartford and Mepco all revolved around the same central issue, i.e., who was at fault for the delay. Therefore, if Saddleback had prevailed on its claim to enforce the bond, Hartford and Mepco would have been liable to Saddleback for the attorney fees it incurred in litigating all of the claims in this case. Civil Code section 1717 operates to make Saddleback liable for the attorney fees that Hartford and Mepco incurred in defending against Saddleback's prosecution of the action to enforce the bond. Because the question of who was at fault for the delay was central to Saddleback's performance bond claim, Mepco was entitled to the attorney fees that it incurred with respect to that issue as well. The trial court thus did not abuse its discretion in awarding Mepco all of the attorney fees that it incurred in litigating this case below.[29]

---

[29] In supplemental briefing, Saddleback contends for the first time that the trial court abused its discretion in awarding Mepco attorney fees for both prosecuting and defending the entire action, and argues that the court should have apportioned the fees between the fees incurred in prosecuting Mepco's action and those incurred in defending against Saddleback's claim for liquidated damages. As an example of fees that the trial court awarded Mepco that Saddleback claims in its supplemental brief were unrelated to defending against Saddleback's claim for liquidated damages, Saddleback cites fees that Mepco requested for the drafting of its complaint, which was filed before Saddleback filed its cross-complaint for liquidated damages. However, Saddleback did not make this argument in the trial court, and did not raise it in either its opening brief or in its reply brief on appeal. Rather than arguing that some apportionment should occur based on when work was performed and the relationship of that work to defending against Saddleback's claims, Saddleback argued that Mepco was not entitled to *any* attorney fees under the performance bond and Civil Code section 1717. Saddleback failed to present the apportionment argument to the trial court and therefore forfeited this claim on appeal. (See *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [77 Cal.Rptr.3d 695] ["General

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.

McConnell, P. J., and McIntyre, J., concurred.

On November 22, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 16, 2011, S188140.

---

arguments that [attorney] fees claimed are excessive, duplicative, or unrelated do not suffice. Failure to raise specific challenges in the trial court forfeits the claim on appeal."].)