Filed 5/9/22  Cook v. Trebino CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CAROLE COOK et al., | H047830<br>H048498 |
| Plaintiffs and Appellants, | |
| v. | (Monterey County<br>Super. Ct. No. 18CV000223) |
| ANNE TREBINO et al., | |
| Defendants and Respondents. | |

In these two appeals, plaintiffs Carole Cook, Joanne Martin, Judy Berry, and Jeff Alsberg[1] appeal from a judgment following a bench trial, in which the trial court determined that the operative complaint was barred by the statute of limitations. Plaintiffs assert that the trial court erred in finding the statute of limitations applicable, and argue that numerous other errors warrant reversal of the judgment. Plaintiffs also appeal the trial court's costs and attorney fees judgment awarding defendants $320,100 in attorney fees. We affirm the judgments.

---

[1] Joanne Martin died in August 2019, before trial on the statute of limitations defense began. Berry was substituted in as a special administrator of the Martin estate to pursue the action on the estate's behalf. Joanne's name sometimes appears as JoAnne in quoted material in the record. We use Joanne, which is the style used by the parties in their briefing.

## I.    BACKGROUND

### A.    *Complaint and Answer*

The dispute involved a property located at 45255 Arroyo Seco Road in Greenfield. According to plaintiffs, the Arroyo Seco property was a family property and had been "passed from generation to generation" since the late 1800's. In December 1991, Walter and Bessie Swenson conveyed the Arroyo Seco property to their children, Joanne Martin and Yvonne Alarid, as tenants in common, each with a 50 percent ownership interest. Walter and Bessie[2] retained a life estate in the property. Walter died in 1992 and Bessie died in 2011.

Between 1992 and 2002, Joanne signed three promissory notes, each for $50,000. The notes were presented to Joanne by Tondre Alarid, Yvonne's husband. Joanne and Yvonne were the borrowers under the notes. Tondre and Yvonne were the lenders. The purpose of the notes was to "cover [Joanne's contribution to] the cost of the Arroyo Seco home expenses as they would arise in the years to come."

In 2006, Joanne placed her share of the ownership of the Arroyo Seco property in the 2006 Joanne Martin Revocable Trust (Martin Trust).

In 2007, a fourth promissory note in the amount of $100,000 was executed, again with Tondre and Yvonne as lenders under the note and Joanne and Yvonne as borrowers.

According to plaintiffs, in January 2010, following a flood at the Arroyo Seco property, Berry[3] and defendants[4] "discussed what to do about repairing the home."

---

[2] Because many of the people involved in the case share the same last name, we often refer to them using their first names.

[3] Cook, Alsberg, and Berry are Joanne's children.

[4] Defendants, successors to Yvonne's and Tondre's interest in the subject property, include: Anne Trebino, individually and as trustee of the Anne Trebino Living Trust; Mary Pezzini, individually; Joseph T. Pezzini and Mary P. Pezzini, as trustees of the Joseph T. Pezzini and Mary P. Pezzini Trust Agreement; Joseph Alarid, individually; Joseph Alarid and Penny J. Alarid, Trustees of the Alarid Family Trust; Kathleen Burke individually; Dennis Burke and Kathleen Burke, Trustees of the Dennis and Kathleen

2

"Defendants indicated to the successor Trustees [Berry and Alsberg] [that] they did not like having multiple owners of the property and offered to take over the property and maintain the property in exchange for [forgiving the] money they stated [Joanne] owed them." Defendants claimed that Joanne owed "over $250,000 for expenses paid" on her behalf. "[Berry and Alsberg] refused to allow defendants to have full ownership of the property and denied [Joanne] owed [defendants] money."

Plaintiffs alleged that in May 2010 Joanne "became completely incapacitated and incompetent" due to "dementia, illness[,] and severe alcoholism." She was "unable to manage her finances, [or] care for herself, and required a caretaker." Cook "was appointed the power of attorney," while Berry and Alsberg "took control of the [Martin Trust] as successor Trustees." In addition, due to Joanne's incapacitation, the Martin Trust became irrevocable.

In March 2011, "defendants again approached . . . [Berry and Alsberg] wanting to take over the Arroyo Seco property." "[Berry and Alsberg] disputed the computation of expenses their mother was being charged with." In particular, they asserted that there were inadequate records as to what purpose the promissory notes had been used for.

In July 2011, Joanne's youngest son, Walter, was murdered. Joanne's "mental state and incompetence deteriorated severely," and she began drinking heavily. She was later admitted to a hospital for severe alcoholism.

On July 26, 2011, Tondre visited Joanne at her home and had her sign a grant deed, conveying her trust's one-half ownership interest in the Arroyo Seco property to the Alarid Living Trust. Plaintiffs alleged that defendants misrepresented the document at the signing and that Joanne was not of sound mind at the time.

---

Alarid-Burke Trust; Anne Trebino and Joseph Alarid as Trustees of the Alarid Living Trust.

3

In 2013, Yvonne died and her share of the Arroyo Seco property was transferred to the Alarid Living Trust and was managed by the successor trustees, defendants in this action. Tondre died in 2014. Ownership of the Arroyo Seco property was divided among defendants.

Plaintiffs alleged that in 2015 they "began to question their mother regarding the Arroyo Seco property" after the locks were changed and they were refused entry. "[Joanne] indicated to her children [that] they could go up to the property anytime they wanted as she owned 50% of the property." "However, defendants informed [the] successor trustee Judy Berry on or about 9/17/15 that the defendants now had full ownership of the Arroyo Seco property and if [they] wanted to use the property they would have to get preapproval from defendant Anne Trebino."

Plaintiffs' original complaint was filed on January 17, 2018, and an amended complaint was filed on February 28, 2018. The amended complaint alleged nine causes of action. The first three causes of action sought to quiet title. The fourth cause of action alleged intentional misrepresentation/fraud, specifically, that defendants misrepresented the amounts owed by Joanne under the promissory notes. The fifth, sixth, and seventh causes of action alleged undue influence, "fraud in the concealment," and "fraud in the execution"—all of which related to the circumstances under which the grant deed was signed. The eighth and ninth causes of action alleged breach of fiduciary duty and negligent misrepresentation, under a theory that defendants failed to account for funds expended on the Arroyo Seco property and presented false accountings. Plaintiffs prayed for declaratory relief, that title to the property be restored to the Martin Trust, attorney fees and costs, and punitive damages.

In June 2018, defendants filed an answer in which they generally denied most of the allegations and raised affirmative defenses including the statute of limitations. Defendants also filed a cross-complaint, which sought, in the event the grant deed was

4

rescinded, to reinstate the promissory notes and establish that plaintiffs were in breach of the notes. Plaintiffs, in their answer, alleged among other things elder abuse as an affirmative defense.

The initial case management conference was scheduled for May 22, 2018, but was later continued to August 7, 2018. Trial was originally scheduled to begin June 17, 2019, but was later continued to October 21, 2019, and then again continued to November 18, 2019.

Prior to trial, defendants filed a motion to bifurcate the statute of limitations defense from the rest of the trial. At the November 18, 2019 trial management conference, the trial court granted the motion. The court noted that the Civil Code provides for addressing issues such as statutes of limitation before trial to save "time and expenses both for the court and for the parties." The parties confirmed that the challenged instrument was signed on July 26, 2011. Plaintiffs asserted that a four-year statute of limitations applied, while defendants argued "[i]t's most likely three years." The court confirmed, "at least for quiet title and the reconveyance issue," that "the four-year statute [applied], [and] that would bring it up to July 26, 2015." The court stated that on the "fraud causes of action, perhaps a three-year statute of limitations [applied,] but I'm going to use the four-year statute of limitations." The parties then discussed the scope of the proposed evidentiary hearing on the statute of limitations issue. Because of a scheduling issue involving one of the witnesses, the parties agreed to start the evidentiary hearing that same day.

### B.  Trial

#### 1.  Judith Berry

The bench trial began on November 18, 2019, and lasted three days. Berry testified first. She testified that she learned about the property transfer in August 2015 after checking "the Monterey County Assessor's Office tax bills and [finding] out that

5

Anne Trebino was the owner of the property, of the parcel." Berry was prompted to check after "[t]here had been a change in the use of the property where Anne Alarid was indicating that we were locked out."

Defense counsel directed Berry to review an e-mail that she had sent dated April 8, 2015, with the subject line "Happy Easter." The e-mail stated: "We are all so appreciative to be able to share with our families the 'sacred' place that is such a huge part of all of us. I feel that you have done exactly what was promised when our mom [Joanne] and your dad [Tondre] settled things up – he said if he owned the cabin he would fix it up (wow did you ever!)." Berry explained that she sent the e-mail to "[try] to change the culture, if you will, or the tenor" of the management of the property. In 2015, there "was discussion about paying fees and lots of changes to the way that [Berry and her family] signed up to use the cabin and was not letting people plan ahead and the use of the cabin dramatically changed in 2015."

Berry was examined concerning her testimony from an earlier deposition. Berry recalled stating, " 'We were told it had been transferred.' " She was asked, " 'When?' " In response, Berry said, " 'Not -- I wasn't told. I believe my sister Carole[] [Cook] was told.' " Berry was asked, " 'When?' " She responded, " 'Sometime in 2011.' " Asked whether Carole told Berry, Berry said: " 'Carole[], she -- yes, she told me she believed it had happened.' " Berry was then asked, " 'So in 2011 when Carole[] told you that she believed that JoAnne had transferred her ownership interest to Tondre and Yvonne, what did you do?' " Berry responded, " 'I didn't do anything. I mean, I was surprised and I was upset.' " Berry stated in her deposition that at the time she learned "JoAnne might have transferred her interest to Tondre and Yvonne," Berry believed that she was acting as a trustee of the Martin Trust at the time of the transfer. At another point in the deposition, Berry stated that she "recall[ed] that [Cook] told me that Anne told her that [Joanne] had signed the property over."

6

Later in the deposition, Berry was asked, " 'And so in response to hearing that your mother had done something that you refused to do, you took no action for over three years?' " Berry responded, " 'Correct.' " Berry was also asked, " 'You made no inquiry as to the terms of the deal?' " Berry responded, " 'I respected my uncle's -- I respected my uncle and I felt there must have -- I didn't question. I felt there must have been some bona fide reason that he would do that and we could trust him.' " At trial, as to this statement, Berry acknowledged the statement in the deposition transcript, but disputed the accuracy of the statement. She asserted, "I asked my mom, 'Did you transfer the property?' And she said, 'No.' I asked Carole[] to look around the house, [are] there any documents? And she said no. And so -- and nothing changed."

Berry also acknowledged being aware that between July 2011 and the end of 2012 "there were significant repair and remodel expenses that occurred at the cabin property." She was also aware that those expenses had been paid exclusively by the Alarid family. Berry acknowledged that "one of the components of the offers made by Tondre prior to July of 2011 was that if he were to acquire sole ownership that he would fix and repair the property at his own expense."

Berry acknowledged another e-mail that she sent to Trebino, dated August 7, 2015: "Below is the offer that was made and accepted by Joanne. She was not represented by an attorney and relied on Tondre's word and her comfort level in you. [¶] Cabin and 62 Acres – Mom's ownership interest transferred to Tondre and Yvonne for the following Total Consideration: [¶] - Joanne's promissory notes and related 8% compound interest paid in full[;] [¶] - $70K paid to Joanne (insurance proceeds)[;] [¶] - Tondre will invest at least $100K into the cabin to repair it to full use again – he will bear all of the cost since he will enjoy 100% ownership[;] [¶] - Joanne and Marty, and each of their kids will have access to the cabin for the remainder of their lifetimes, to use it 'whenever they want to go and just as they have used it in the past. As owner, I will

7

take care of all the costs to maintain the cabin. All you have to do is call up when you want to use the cabin and its [*sic*] yours.'[;] [¶] - The deal was accepted when Tondre came to Mom's house shortly after Walter's death, so mom understood that Amber would assume Walter's rights." (Boldface and underscoring omitted.) The e-mail went on to describe that the cabin had been "a mess after the flood" and "Tondre was motivated to get the ownership into one party's hands" so that the property could be repaired and maintained properly. The e-mail described Joanne as "dismayed" about the debt she owed and eager to not "have a 'fight' over it with family." "When [Tondre] made the offer to take over the cabin, [Joanne] trusted Tondre's intentions [and] wanted to end the emotional strife that she felt with her sister. Mom only discussed Tondre's offer with Carole. Nobody expected any deal to be finalized until after Grandma passed. The rest of us were surprised and very upset when we learned of the transfer just a week or so after Walter's funeral, because we had lined up the financing and were prepared to settle the debt when it came due on Grandma's passing." The e-mail went on to emphasize that the deal was intended to allow "in substance, a life estate easement" for Joanne's children, and the e-mail proposed to "start out fresh again in 2016" with "a calendar and simple mechanism to lay out dates for everyone."

At trial, Berry stated she had a different recollection about when she learned about the transaction. She explained that what had actually happened was that she had learned that Tondre and Yvonne had come by and attempted to acquire Joanne's interest, not that they had succeeded. "That was what I was recalling in 2018, but I've subsequently talked to my sister [Cook] and she's reminded me that Anne never told her that the transfer happened." Berry explained that the e-mail in which she described the details of the property transaction was "pieced . . . together based on [her] recollection of what had been offered either directly in [her] first conversation with Tondre or in a conversation that Anne had with [her] sister Linda in 2010." Berry maintained that she "asked [her

8

mother] a few times over the years" about whether the property had been transferred and she repeatedly said "no" as late as 2019.

Berry was shown a document entitled "Durable Power of Attorney," which appointed Eugene Martin, Joanne's husband, as her "Attorney in Fact." The document was dated February 8, 2006. It also provided that "[i]f the Attorney in Fact named above is unable or unwilling to act," then Berry and Alsberg were "Co-Attorneys in Fact." Additionally, "[i]f one of the Co-Attorneys in Fact is unable or unwilling to serve, then the remaining Co-Attorney in Fact may serve as sole Attorney in Fact." Berry acknowledged that she indicated "in the verified complaint [in this case] that [Eugene] was incapable of handling his affairs . . . in 2011" because of a "major stroke" he had in 2010.

Berry was also shown property tax bills for the Arroyo Seco property, for tax years 2014-2015 and 2015-2016. The "assessed owner" on the 2014-2015 property tax bill was "SWENSON WALTER K & BESSIE T LIFE ESTATE." The "assessed owner" on the 2015-2016 property tax bill was "MARTIN JOANNE SWENSON TR ET AL." The parcel number on each statement was 419-432-003-000, which matched the parcel number on the grant deed.[5] Berry, however, believed that these tax bills were "not . . . for the cabin property."

### 2. Carole Cook

Cook acknowledged discussing with Trebino the terms of potential purchase offers for Joanne's interest in the Arroyo Seco property prior to July 26, 2011. One constant was that Anne Trebino "always told [Cook] nothing will change, Walter can always live there and nothing -- don't worry, nothing will ever change, it's always going to be the cabin." After Walter died on July 10, 2011, Cook was worried about Joanne.

---

[5] The parties later stipulated that this was the parcel number for the Arroyo Seco property.

Cook was aware that one proposal involved a promise that Tondre would repair and improve the property, and they "thought it was going to cost around [$]100,000." Cook also knew that there were repairs and remodeling underway in the fall of 2011, but believed that insurance proceeds were being used. Cook acknowledged, however, that she also believed that her mother had been paid her half of the insurance proceeds—about $20,000—prior to the renovation work. She also knew her mother had received $70,000, but testified she did not know where the other $50,000 came from. Cook acknowledged knowing that the claimed debt owed by her mother on the promissory notes was $250,000, that the property had been appraised at about $550,000, and that her mother's portion of that was $275,000.

Cook was directed to review a declaration that she had signed, in which she stated that on July 26, 2011, she returned home and when she entered the dining room, she "noticed multiple checks from Anne Trebino on the table." One check was for $50,000, and two checks were for $10,000. She stated that she questioned her mother "if defendants had her transfer the Swenson cabin to defendants." Her mother "stated that she did not." "Not knowing what defendants had [her] mother sign . . . I contacted my sister Judy" and "let her know that the defendants were at the house when we were gone and had my mother sign a document." Cook acknowledged that the deposition statements were correct. Cook claimed that her mother "said she thought she still owned the property and that the debt was, you know, somehow taken care of." Cook maintained that her mother was not of sound mind at the time, and suffered from dementia.

Cook was asked whether, on September 23, 2011, her mother "gave instructions that each of her five children was to be given $10,000, and her granddaughter . . . was to be given $6,000, and that the remaining portion of the funds was to be put in a joint account in your name and hers[.]" Cook stated Joanne "could have" done that, and Cook acknowledged getting "some money."

10

Cook testified she became aware of the property transaction in 2015 after Berry "looked at some tax bills" and discovered the property had changed hands. Cook stated that she "[m]ore than likely" ran a title search too, because she ran "a lot of title searches." Cook acknowledged that in her deposition she was asked, " 'did you tell Judy sometime in 2011 the property was transferred?' " She responded, " 'I don't know. Like I said, I was busy dealing with other stuff. I'm saying, you know, we probably speculated that it was but I was told nothing was going to change.' "

### 3.    *Anne Trebino*

Trebino, daughter of Tondre and Yvonne, testified that in 2008 she had attended a meeting with her parents, Berry, and Alsberg concerning the debt owed by Joanne on the promissory notes. Berry and Alsberg were given a spreadsheet and an accounting, which included the amortization schedule. Berry and Alsberg "were surprised that the dollar amount had gotten so high." Trebino stated that the purpose of the money was to "take care of Bessy."

Trebino recalled that there was another meeting in 2011, where Joanne's children proposed using the house "as collateral for the balance owed on the note[s]." Tondre rejected the idea because he did not want to have to foreclose on Joanne if the notes were not paid. Trebino stated she was not involved in the procurement of the grant deed on July 26, 2011. However, she did discuss the property transfer with Joanne sometime after it happened, asking her "are you okay now that the notes are settled and that burden has been relieved from you?" Joanne replied, "well no, not really because I gave away my childhood home."

### 4.    *Mary Pezzini*

Pezzini testified that in 2008 she created a spreadsheet detailing the expenses underlying Martin's debt on the notes. She recalled that Anne, Judy, and Linda attended a meeting in 2008 about the debt. She described that "they were really surprised at the

11

amounts that were owed because . . . they didn't realize that grandma needed so much money to live on."

### 5. Jeffrey Alsberg

Alsberg testified that he took over management of the Martin Trust in 2008. By 2010, he was managing the trust with his sister, Berry, full-time. Alsberg testified that he first "starting hearing" that the property had been transferred in 2015. He stated he visited the Arroyo Seco property on July 26, 2011, but did not know until 2015 that Tondre had been by earlier that day or that checks had been left there.

### 6. Linda White

Linda White, Joanne's daughter, testified that she and her family used the cabin "[p]retty often" between 1992 and 2005. From 2005 to 2011, they used it "a little less often." Between July 26, 2011 and fall 2015, their use was "still the same." From fall 2015 onward, White found out from her sister, Judy, that they could no longer use the cabin. She learned in August or September 2011 that checks had been left at her mother's house on July 26, 2011, but believed they were insurance checks.

White was told prior to July 26, 2011, that her mother had amassed a considerable debt—White was "shocked to see the amount." Tondre proposed to "settle the debt" by having Joanne transfer her interest in the Arroyo Seco property. "[B]oth [Alsberg] and [White] said absolutely not, we don't want to give up . . . the cabin." White said her mother was "present in the house" when this meeting occurred, but "she was uncomfortable in general" and did not "really underst[and] what was going on."

White knew that sometime after July 2011, "a pretty significant repair and remodel" occurred at the Arroyo Seco property. At the end of June 2012, White went to the property and saw the remodel work. White also knew that "one of the offers that Tondre had made . . . was that if he got full ownership, that he would fix . . . up [the property] at his own expense[.]" White learned "a couple months" after July 26, 2011,

12

that her mother received checks totaling $70,000. White affirmed that she had "no idea in 2011" that her mother had transferred her interest in the property.

### C.    Decision

Following the evidentiary hearing, the trial court issued a statement of decision, finding in favor of defendants on the statute of limitations affirmative defense. Using the longest possible limitations period of four years, the court first determined that the complaint should have been filed before July 26, 2015. The court noted that Berry, Alsberg, and Cook "testified at trial that they knew that their mother signed a document on July 26, 2011 when Tondre came by Joanne's house and they knew that checks in the amount of $70,000 were left for Joanne." The court noted that they also knew of the debt cancellation and that Tondre was investing money in renovation of the property.

The trial court recounted more evidence of plaintiffs' knowledge of the transfer. The court highlighted the e-mail correspondence involving Berry from 2015, finding that it "directly contradicted Judy Berry's court testimony." The court also noted Berry's deposition testimony, where she indicated three times she had been told in 2011 that the property had been transferred. Finally, the court noted that the grant deed that is the subject of the lawsuit had been recorded in August 2011. The court then observed that "Carole Cook testified that she frequently ran title search reports for her job, but neither she [n]or Judy Berry checked the public record status of the deed"—"nor did they talk to Tondre Alarid, despite evidence that Carole was told of the transfer by Anne Tre[b]ino in 2011."

In light of the evidence, the court determined that plaintiffs' claim—that they did not discover the property transfer had occurred until August or September 2015—was "not credible in light of the evidence produced by defendants." The court concluded that the "record supports the conclusion that Judy Berry and Carol[e] Cook knew of the transaction shortly after it occurred. If they did not know, there were sufficient facts that

13

they did know that would cause a reasonable person to be suspicious and engage in further investigation."  Accordingly, because the complaint had been filed after the expiration of the limitations period, the court found in favor of defendants on the statute of limitations affirmative defense.  Judgment was entered and plaintiffs timely appealed.  Subsequently, the court issued a costs and fees judgment, and plaintiffs also timely appealed from that judgment.

## II.    DISCUSSION

### A.    *Statute of Limitations and Delayed Discovery*

Plaintiffs contend that the trial court misapplied the law.  They argue that under the delayed discovery rule for fraud actions, the limitations period did not begin to run until plaintiffs were "locked out" in August 2015.

#### 1.    *Legal Background*

"[T]here is no statute of limitations that generally governs all actions to quiet title. [Citation.]  Instead, courts look to the underlying theory of relief to determine the applicable period of limitations.  [Citation.]  An inquiry into the underlying theory requires the court to identify the nature (i.e., the 'gravamen') of the cause of action. [Citation.]  We look to the nature of the right asserted, not the form of action or relief sought.  [Citation.]"  (*Huang v. Wells Fargo Bank, N.A.* (2020) 48 Cal.App.5th 431, 437.)

" '[T]he most likely time limits for a quiet title action are the five-year limitations period for adverse possession, the four-year limitations period for cancellation of an instrument, or the three-year limitations period for claims based upon fraud and mistake.' "  (*Walters v. Boosinger* (2016) 2 Cal.App.5th 421, 428, fn. omitted. (*Walters*).) A cause of action for quiet title based upon fraud or mistake is three years.  (Code Civ. Proc., § 338, subd. (d).)  The limitations period for any actions not covered by any other statute of limitation is four years.  (Code Civ. Proc., § 343; *Leeper v. Beltrami* (1959) 53 Cal.2d 195, 212 [quiet title based on rescission]; *Walters*, at pp. 432-433 [quiet title based

14

on voidness against public policy]; *Moss v. Moss* (1942) 20 Cal.2d 640, 644-645 [quiet title based on undue influence].) The limitations period for "action[s] for the recovery of real property" or "action[s] . . . arising out of the title to real property" is five years from the date the plaintiff or his "grantor" is no longer in possession of the property. (Code Civ. Proc., §§ 318, 319.)

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807 (*Fox*).) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. [Citations.] [We previously] explained that by discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, [we were] referring to the 'generic' elements of wrongdoing, causation, and harm. [Citation.] In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Id.* at p. 807.)

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ' " 'information of circumstances to put [them] *on inquiry*' " ' or if they have ' " 'the opportunity to obtain knowledge from sources open to [their] investigation.' " '

15

[Citations.] In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Fox*, *supra*, 35 Cal.4th. at pp. 807-808, fn. omitted.)

To invoke the " 'delayed discovery' " rule, a plaintiff must plead facts sufficient to convince the trial judge that delayed discovery was justified. (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1310.) Specifically, the plaintiff must plead (1) the time and manner of discovery; and (2) " 'the inability to have made earlier discovery despite reasonable diligence.' " (*Fox*, *supra*, 35 Cal.4th at pp. 808.)

Resolution of a statute of limitations issue is normally a question of fact. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.) A trial court's findings on the accrual of a cause of action will be upheld on appeal if supported by substantial evidence. (*Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 17.) To be considered substantial, evidence must be " 'reasonable in nature, credible, and of solid value.' " (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204.) We view the record "in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court." (*Id.* at p. 1203.) The credibility of witnesses is particularly a matter within the province of the trial court, and we will not discredit testimony credited by the trial court "unless it is physically impossible or inherently improbable and such inherent improbability plainly appears." (*Id.* at p. 1204.)

### 2.     *Analysis*

The subject property was transferred on July 26, 2011. The original complaint was filed on January 17, 2018. Assuming without deciding that the longest conceivable

statute of limitations period was applicable—the four-year limitations period—plaintiffs had until July 26, 2015, to challenge the property transfer absent delayed discovery.[6]

Here, substantial evidence supports the trial court's findings that plaintiffs actually discovered the factual basis of the quiet title claim at about the time when the transfer occurred. In an e-mail sent on August 7, 2015, Berry recounted the terms and consideration involved in the property transfer. The e-mail also stated: "[t]he rest of us were surprised and very upset when we *learned of the transfer just a week or so after Walter's funeral . . . .*" (Italics added.) Berry emphasized: "[W]e deserve to receive what was bargained for without unreasonable restrictions." In another e-mail, this time from April 8, 2015, Berry noted how "[w]e are all so appreciative to be able to share" the cabin, and emphasized that she felt "that you have done exactly what was promised when our mom and your dad settled things up – he said if he owned the cabin he would fix it up (wow did he ever!)." Berry confirmed at least twice in a deposition that she was told in 2011 about the property transfer, which left her " 'surprised and . . . upset.' " Berry also stated in her deposition that when she learned of the transfer, she believed she was an acting trustee of the Martin Trust. These e-mails, in combination with Berry's deposition testimony, constitute substantial evidence that plaintiffs were aware of the property transfer almost as it happened.

In addition, substantial evidence also supports the trial court's finding that even if they had no actual knowledge, plaintiffs had good reason to discover or suspect the factual basis for a quiet title claim. Berry testified that she knew that between July 2011 and 2012, significant renovations and repairs were undertaken by Tondre and his family. Berry and Cook testified that they knew that a critical component of Tondre's earlier

---

[6] We do not consider the five-year limitations period under Code of Civil Procedure sections 318 and 319 at all applicable because it pertains to adverse possession, which was not the factual or legal theory developed by plaintiffs in the trial court. (*Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 325.)

17

offers to acquire the property involved a promise that he would fix and repair the property at his own expense. Cook knew that significant renovation work was underway in the fall of 2011. Cook testified to knowing that their mother had received $70,000 in checks, something Cook attested to in detail in a sworn declaration, and to telling Berry about it. Cook knew that her mother's debt was "somehow taken care of." Finally, Cook testified that she knew that defendants "were at the house . . . and they had Joanne sign a document" on July 26, 2011, and Cook admitted to regularly running title searches.

Even assuming no actual knowledge, based on the foregoing, plaintiffs had sufficient reason to *suspect* the factual basis for a quiet title claim, such that a reasonable investigation would have uncovered the alleged injury. (*Fox*, *supra*, 35 Cal.4th at pp. 807-808.)

Plaintiffs argue that the trial court misapplied the law by failing to apply an exception for delayed discovery of fraud claims. Plaintiffs contend that for fraud actions, a cause of action " 'is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.' [Citation.]" We disagree. Code of Civil Procedure section 338, subdivision (d), which "effectively codifies the delayed discovery rule in connection with actions for fraud" (*Brandon G. v. Gray* (2003) 111 Cal.App.4th 29, 35), is still subject to the general rule that "discovery" is not limited to actual discovery. As our Supreme Court has explained: "In a long line of cases we have held that a cause of action for fraud or mistake accrues, and the limitations period commences to run, when the aggrieved party could have discovered the fraud or mistake through the exercise of reasonable diligence." (*Sun'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701.) Thus, in actions for fraud, the delayed discovery rule is functionally the same as it is for all other types of actions. Accordingly, in finding plaintiffs *could have* discovered the facts underlying the quiet title claim, the trial court appropriately applied the delayed discovery rule as it exists for fraud.

18

Plaintiffs also argue that they could not have discovered the facts underlying their claims because "[t]hey were never informed the property transferred," and "[t]here were no facts to put [them] on notice . . . until they were locked out in August 2015." The trial court's statement of decision reflects that it considered plaintiffs' assertions that they discovered the property transfer in late 2015, but concluded that the testimony was not credible in light of other evidence. Plaintiffs' arguments amount to a disagreement with the trial court's assessment. On review for substantial evidence, we will not reweigh evidence, redetermine witness credibility, or resolve conflicts in the testimony.

Plaintiffs next argue that the trial court erred by failing to determine "if and when Joanne Martin was incompetent and/or incapacitated" and who was trustee of the Martin Trust on July 26, 2011. They assert that these findings were essential to determining the statute of limitations issue. Not so. "The admission of fact in a pleading is a 'judicial admission.'" (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271.) " 'An admission in the pleadings is not treated procedurally as evidence; i.e., the pleading need not (and should not) be offered in evidence, but may be commented on in argument and relied on as part of the case. And it is fundamentally different from evidence: It is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues. Under the doctrine of 'conclusiveness of pleadings,' a pleader is bound by well pleaded material allegations or by failure to deny well pleaded material allegations. [Citations.]' [Citation.]" (*Ibid.*)

Here, the amended complaint alleged the following: Martin became "completely incapacitated" in May 2010; Cook thereafter began acting as Martin's power of attorney; and Berry and Alsberg then began acting as successor trustees of the Martin Trust. Alsberg confirmed in his testimony that he was "managing the trust with [Berry] full-time" in 2010. Thus, the pleadings, which framed the facts of the case, established that Berry and Alsberg were co-successor trustees on July 26, 2011. In addition, their

19

testimony was that they believed themselves to be trustees at the time of the transfer. Accordingly, it was their knowledge that was the critical to the trial court's determination as to when they discovered or should have discovered the property transfer.

### B.     Statement of Decision

Plaintiffs argue that the statement of decision "did not contain definite and certain findings" because "[m]ultiple material issues were not decided or included in the judgment that affected the statute of limitations." Plaintiffs point to the following issues: Martin's capacity between 2007 and 2018; identity of the trustee in 2011; when plaintiffs "discovered the fraudulent conduct"; "the validity of the Grant Deed"; and "the Fiduciary relationship between the parties." Defendants assert that the claim is waived because plaintiffs failed to object to the statement of decision.

#### 1.     Procedural History

After the court issued its statement of decision, plaintiffs filed a motion for reconsideration. Plaintiffs argued that they "were not allowed to present evidence and testimony regarding their other causes of action with different statute of limitations law, facts and circumstances," including: that plaintiffs' "fraud actions [were] not considered or adjudicated by the Court"; different limitations periods apply to fraud actions; testimony on the fraud actions was not permitted; testimony and evidence on the successor trustee appointment process was not permitted; testimony as to Berry's and Alsberg's status as successor trustees on July 26, 2011, was not permitted; the trial court did not examine the validity of the grant deed or the fiduciary relationship between Martin and defendants; and the trial court did not permit evidence or testimony on the validity of the promissory notes.

At a hearing, plaintiffs asserted that there were "five fraud actions" in addition to the quiet title claim. Plaintiffs claimed "we had at least 10 different witnesses to testify as to issues regarding the fraud." Plaintiffs asserted that there was "no way" for them to

20

have discovered that the fraud had occurred prior to 2017.  Only after litigation began did they discover the extent of the alleged fraud.  Plaintiffs maintained that "these issues [were separate] from the quiet title issues.  And along that line, the Court never decided who was the rightful trustee in 2011."  Plaintiffs suggested that Joanne's husband was "actually the first successor trustee" and that Berry and Alsberg "were not the successor trustees."  Plaintiffs also argued that Cook had no "authority to act . . . under the trust."  Finally, plaintiffs contended that they needed to "put on all the testimony regarding the different types of fiduciary relationship[s]" when the fraud occurred and "to question people on what they actually did in managing the property throughout the 19 years."

Defendants argued that "this is [not] really a motion for reconsideration.  It's a premature appeal."  They noted that a motion for reconsideration must be "based upon new facts, circumstances, or law that were not possessed . . . prior to the trial.  And here, Plaintiffs are essentially arguing that because you granted the motion to bifurcate, they were prevented from presenting evidence in support of their prima facie claims, and that you made the wrong decision in, one, granting the motion to bifurcate, and, two, in deciding all claims were barred by the statute of limitations."  Defendants asserted that the proper remedy for challenging these decisions was an appeal.

The trial court denied the motion for reconsideration.  The court stated "that the [statement of] decision sets out . . . fairly clearly [that] many of the arguments that are being made today were made at the time of trial."  While the court acknowledged that it "narrowed the inquiry as to the statute of limitations only," it concluded that plaintiffs' motion amounted to "a disagreement with the [court's] application of the law."

### 2.    *Analysis*

"Upon the timely request of one of the parties in a nonjury trial, a trial court is required to render a statement of decision addressing the factual and legal bases for its decision as to each of the principal controverted issues of the case.  (Code Civ. Proc.,

21

§ 632.)  A statement of decision need not address all the legal and factual issues raised by the parties.  Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision.  [Citations.]  '[A] trial court rendering a statement of decision under . . . [Code of Civil Procedure] section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them.  [Citation.]'  [Citations.]  In other words, a trial court rendering a statement of decision is required only to set out ultimate findings rather than evidentiary ones." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125.)

Here, the trial court's statement of decision identified the principal controverted issue as whether plaintiffs' claims were barred by statute of limitations.  The court correctly identified the gravamen of the complaint as a challenge to the property transfer that occurred on July 26, 2011.  The court then noted that the longest limitations period that could apply was four years, which meant that the complaint should have been filed before July 26, 2015.  The court then recounted plaintiffs' contention that the delayed discovery rule should be applied because they learned of the property transfer in August or September 2015, and the court acknowledged plaintiffs' argument about a fiduciary relationship.

To the extent that plaintiffs complain that certain issues were unresolved in the statement of decision, those issues were either unnecessary to the statute of limitations defense or were necessarily included in the court's findings.  Plaintiffs' fraud allegations, for instance, went to the merits of plaintiffs' claim that the property transfer should be unwound.  It was not necessary for the determination of whether plaintiffs waited too long to pursue the claim.  For the same reason, the trial court did not need to examine the validity of the grant deed or the promissory notes.  In addition, although plaintiffs

22

complain that the trial court did not address their claim that defendants owed a fiduciary duty, the court did in fact address that claim. Finally, no detailed discussion of Berry's or Alsberg's status as trustees was necessary, as that finding was an intermediary evidentiary finding, not an ultimate fact.

In sum, we find the trial court's statement of decision was sufficient to satisfy its obligations under Code of Civil Procedure section 632.

### C. Jury Trial Waiver

Plaintiffs contend that the trial court erred by not allowing a jury trial on the statute of limitations issue.

#### 1. Background

At a pretrial hearing on November 18, 2019, the trial court discussed with plaintiffs the "waiver of the jury trial on your part." The court indicated that there was no record that plaintiffs "ever paid the jury fees"—"we looked and we couldn't find any." The court reminded plaintiffs' counsel that "[t]hose are required by statute." Plaintiffs' counsel stated that she "really thought I did [pay it]," and stated that she would check her records when she returned to her office. The court noted that "usually [the fees] need to be paid before the first case management conference," or "at the very least by the time trial is set." Plaintiffs' counsel again promised to "look into my books and find out because I know I sent a check in for it."

On the second day of trial on the statute of limitations defense, the trial court considered plaintiffs' motion for relief from waiver of jury fees. The court first confirmed with plaintiffs' counsel, "it appears that you[] haven't presented a check to the court, correct?" Plaintiffs' counsel responded, "Correct." The court then determined, "I'm going to grant your motion for waiver of jury fees. Although it would not pertain to the Statute of Limitations issue." Plaintiffs' counsel again responded, "Correct."

23

### 2. Analysis

"A party in a civil case may waive the right to a jury trial under [Code of Civil Procedure] section 631 in several ways, including by failing to deposit jury fees 'on or before the date scheduled for the initial case management conference in the action.' [Code Civ. Proc.,] § 631, subd. (c), § 631, subd. (f)(5).) Even when a civil litigant waives his or her right to a jury trial, however, the trial court has discretion to 'allow a trial by jury.' [Citations.] The trial court should grant a motion for relief of a jury waiver 'unless, and except, where granting such a motion would work serious hardship to the objecting party.' [Citations.] When there is doubt about whether to grant relief from a jury trial waiver, the court must resolve that doubt in favor of the party seeking a jury trial. [Citations.]" (*Mackovska v. Viewcrest Road Properties LLC* (2019) 40 Cal.App.5th 1, 9-10.) "In exercising its discretion, the trial court may consider delay in rescheduling jury trial, lack of funds, timeliness of the request and prejudice to the litigants. [Citation.]" (*Gann v. Williams Brothers Realty, Inc.* (1991) 231 Cal.App.3d 1698, 1704.)

Here, we discern no error in the trial court's decision on the jury waiver issue. Plaintiffs waived their right to a jury trial by failing to deposit jury fees before the date scheduled for the initial case management conference. Plaintiffs confirmed on the second day of the bench trial that they had not "presented a check to the court . . . ." The court, however, granted the motion for relief of a jury fee waiver as it pertained to any merits trial that might occur after the bench trial on the statute of limitations issue. Such relief could not possibly apply to the statute of limitations trial because the bench trial on that issue had already started. Plaintiffs' counsel recognized this by confirming that the waiver would "not pertain to the Statute of Limitations issue." Thus, the trial court did not abuse its discretion, as it granted relief from waiver where it could and correctly recognized that, at the time it considered the request for relief, no relief was possible on the statute of limitations defense.

24

### D.	*Leave to Amend*

Plaintiffs argue that the trial court abused its discretion by refusing to allow plaintiffs to amend their complaint to add a cause of action for elder financial abuse.

### 1.	*Background*

On November 8, 2019, ten days before the November 18, 2019 trial date, plaintiffs filed a motion for leave to amend their complaint. Plaintiffs sought to add a cause of action for elder financial abuse. (Welf. & Inst. Code, § 15610 et seq.) At a hearing, plaintiffs reported receiving "thousands of documents from defendants" in August or September 2018, and more documents in February 2019. According to plaintiffs, there was a summary judgment motion in January 2019 and an appeal, which resulted in the case being stayed until June 2019. Plaintiffs retained an expert, who reported on October 3, 2019 "that there was evidence of usury and that they had overspent the notes." Then, "[w]e were due to depose Mr. Bunning [the expert] on October 7," but "that didn't happen until November 4th." "Once [plaintiffs] got Mr. Bunning[']s notice, [counsel] immediately filed for the motion to amend . . . ."

The trial court asked plaintiffs why they had delayed in adding the claim, noting that "the motion is being made actually past the day that was originally set for trial." Plaintiffs maintained that there was "a lot of financial data that trickled in over the course of 2019" and that there were "3,000 pages of stuff to go through," which meant it took time for the retained expert to "correlate everything and put everything in order to figure out what happened."

Defense counsel maintained that spreadsheets with expenses were provided in 2010 and 2011, and noted that the amended complaint stated that "there was an accounting prepared in 2015 . . . ." Defendants observed that "in [plaintiffs'] memorandum in support . . . plaintiffs admit that they discovered the facts giving rise to the elder [financial] abuse claims on June 25, 2018." Defendants also observed that in

25

"[plaintiffs'] answer to the first amended cross-complaint, which was filed October 23, 2018, they allege[d] as an affirmative defense elder abuse" and "there was also a usury claim . . . as an affirmative defense."

The trial court then observed that in an amended cross-complaint filed August 6, 2018, there was an attachment that included financial spreadsheets.  Plaintiffs acknowledged receiving it in August 2018, but stated that they were unable to have them examined by an expert because "[w]e were still in the midst of discovery," there were pending motions, and "[a]ll the documents they have . . . were all mixed together."  As for the allegation of elder financial abuse in the answer to the cross-complaint, plaintiffs stated that they "did not have the evidence to support . . . the actual claim of financial elder abuse," although they suspected it, and so they added it to the answer "[a]s a safeguard."

Defendants asserted that the elder financial abuse claim involved new damages claims:  "tort damages of significance," "pain and suffering, emotional [distress] damages exceeding $500,000," and additional statutory damages that are recoverable under the elder financial abuse statute.  Previously, plaintiffs sought primarily a declaratory judgment and recission damages—meaning the return of the property.  Defendants asserted that an amendment would create undue hardship, as it would require them to reopen discovery because "we didn't conduct any discovery on that type of damages."

The trial court denied the motion to file a second amended complaint.  It noted that the documents informing the elder financial abuse claim were provided in August 2018.  Additional documentation was provided in February 2019, but plaintiffs' expert was not retained until April 2019.  The court also observed that plaintiffs raised similar claims in their answer to the amended cross-complaint.  The court found that it would be prejudicial to allow the filing of the second amended complaint, particularly because it would require additional discovery.

26

## *2. Analysis*

A trial court may allow the amendment of a pleading at any time up to and including trial. (Code Civ. Proc., §§ 473, subd. (a)(1), 576.) " ' "[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]" ' [Citations.] Courts must apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial, when no prejudice is shown to the adverse party. [Citation.] However, ' "even if a good amendment is proposed in proper form, *unwarranted delay* in presenting it may—of itself—be a valid reason for denial." ' " (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746, italics added.) Moreover, leave to amend a pleading at trial is properly denied if the proposed amendment raises new issues that the opposing party has had no opportunity to defend. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) The trial court's ruling on a motion to amend a pleading is reviewed under an abuse of discretion standard. (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 135.)

Here, the record reflects that there was an unwarranted delay in presenting the elder financial abuse claim. The rough outlines of the claim appear to have been known to plaintiffs in 2018, and detailed financial documents were provided in early 2019. In addition, amendment of the complaint would have required reopening discovery. On the eve of trial, this undoubtedly would have resulted in prejudice to the adverse party. Accordingly, the trial court did not abuse its discretion in denying the motion for leave to amend the complaint.

### *E. Attorney Fees*

Plaintiffs challenge the validity of the attorney fees award on a number of grounds. Plaintiffs contend: there was no contractual basis for the award; an action in tort cannot

support an award of attorney fees; defendants were not a party to the documents containing the attorney fees provisions; the documents containing the attorney fees provisions were never litigated on the merits; simply raising an affirmative defense does not entitle defendants to attorney fees; and the Martin estate and Martin Trust are not obligated under the attorney fees provisions.

### 1. Background

Following entry of judgment, defendants filed a motion for costs and attorney fees, and a motion for payment of expert witness fees due to plaintiffs' failure to accept a Code of Civil Procedure section 998 settlement offer.[7] Defendants contended that, as the prevailing party, an award of attorney fees was proper under Civil Code section 1717 and Code of Civil Procedure section 1021. Defendants stated that the total charges incurred by defendants, inclusive of expenses and attorney fees, was $576,489.50.

Defendants pointed to the four promissory notes, from 1992, 1997, 2002, and 2007, to which Joanne was a signatory, and a 2007 deed of trust that secured the 2007 promissory note. The notes stated, in relevant part, "Should suit be commenced or an attorney employed to enforce payment of this note, the undersigned agrees to pay such additional sum as the court may adjudge reasonable attorney's fees in said suit." The promissory notes were signed by Joanne, and each note including a promise to pay "TONDRE ALARID and YVONNE ALARID" the amount indicated on the note. Each promissory note was secured by a deed of trust, recorded in the same years the promissory notes were signed. The deeds of trust encumbered numerous properties in which Joanne had an interest, including the Arroyo Seco property. The deeds of trust identified Joanne, "a married woman as her sole and separate property," as trustor. The 2007 deed of trust obliged Joanne, as trustor, to "appear in and defend any action or

---

[7] As plaintiffs challenge only the award of attorney fees, we do not discuss any of the background involving the request for expert witness fees.

28

proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust." In 2011, the promissory notes were paid and the deeds of trust were reconveyed as part of the deal involving the Arroyo Seco property.

In asserting that the attorney fees provisions controlled, defendants noted that Yvonne and Tondre forgave the notes and extinguished the deeds of trust as partial consideration for the challenged property transfer. Defendants contended that they were entitled to collect attorney fees under the provision in the notes allowing for such fees "if any suit should be commenced or attorney employed to 'enforce the payment of this note.' " Since the only payment on the note was the July 2011 grant deed reconveying Joanne's interest in the Arroyo Seco property, defendants argued that the action to rescind that transfer fell squarely within the ambit of the notes' attorney fees provision. Defendants also noted that plaintiffs disputed that they had any obligation under the notes, and "sought to disgorge from defendants all prior payments on the promissory notes." Finally, defendants argued that it was proper to seek attorney fees against plaintiffs as nonsignatories because they "stood in the shoes of Ms. Martin as trustees of the Martin Trust and as successors in interest to the Martin Estate." (Capitalization, boldface & underscoring omitted.) Specifically, Berry and Alsberg were trustees of the Martin Trust and Berry "was appointed special personal representative to prosecute claims brought by Ms. Martin." Trebino, Pezzini, Alarid, and Burke, for their part, "are the children of . . . Tondre and Yvonne Alarid, are the beneficiaries of [their] estate, and are therefore entitled to enforce the Notes signed by their parents."

29

At the first hearing on the motion, the trial court[8] indicated it was "not buying [the] argument" that Berry was a successor in interest and responsible for the debts of the estate. However, the court did agree that plaintiffs' "whole case was to set aside the note and deed of trust. It was to rescind it." Plaintiffs insisted that the "complaint was to set aside the grant deed based on fraud," and it was "not about any contract action." The court disagreed: "Well, it was in fact an action involving that note and deed of trust. The [Martin] trust . . . accepted the benefits of that note and proceeded under the theory that it has control of that transaction." The court then addressed "the question . . . as to against whom attorney fees would be awarded and in what capacity." In the court's estimation, plaintiffs had pursued the action as either representatives of Joanne as an individual or as representatives of the Martin Trust. The court then asked defendants if they were "seeking attorneys fees against these individuals in their individual capacity," as it did not "see a basis for it." Defendants clarified that they sought attorney fees only against the Martin estate and the Martin Trust. The court continued the matter, indicating it needed additional time to "look at the amount of fees that are being sought," and it needed additional supporting declarations.

Defendants thereafter submitted additional declarations in support of the amount of legal fees requested. The trial court held three additional hearings on the attorney fees issue. At the second hearing, the court awarded expert witness fees and costs in the amounts requested. The court also approved an award of $95,100 of attorney fees. The court indicated, however, it needed additional information to support attorney fee requests for $243,225 and $175,000.

After additional briefing and after the last hearing, the trial court issued a second order on the attorney fees issue, which awarded an additional $225,000 in attorney fees. Thereafter, a costs and fees judgment was entered, awarding defendants a total of

[8] A different trial judge ruled on the attorney fees motion.

30

$365,428.30 in costs and attorney fees, of which $320,100 was attorney fees. The costs and fees judgment specified that "[t]he attorneys' fees are based on the notes and deeds of trust, which are obligations of the estate of Joanne Martin and the Martin Trust, not of the individual Plaintiffs." Plaintiffs timely appealed.

### 2. Analysis

The rules governing an award of attorney fees are well established. "Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).) This rule is codified in Code of Civil Procedure section 1021, which also "permits parties to ' "contract out" of the American rule' by executing an agreement that allocates attorney fees." (*Mountain Air*, at p. 751.) Thus, " ' "[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." ' " (*Ibid.*)

In addition to Code of Civil Procedure section 1021, Civil Code section 1717, subdivision (a) provides that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

"The primary purpose of [Civil Code] section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 (*Santisas*).) Therefore, where a contract provides the right to attorney fees to only one party, "the effect of [Civil Code] section 1717 is to allow recovery of attorney fees by whichever contracting party prevails, 'whether he or she is the party specified in the contract or not' ([Civ. Code,] § 1717, subd. (a))." (*Id.* at

31

p. 611.) "Because of its more limited scope, Civil Code section 1717 cannot be said to supersede or limit the broad right of parties pursuant to Code of Civil Procedure section 1021 to make attorney fees agreements." (*Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1342.)

" ' "On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' [Citation.] In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.' [Citations.]" (*Mountain Air*, *supra*, 3 Cal.5th at p. 751.)

Here, defendants are the prevailing party. To determine whether they are entitled to an award of attorney fees, we must determine whether the promissory notes or deed of trust provided a basis for the award. "To answer this question, we apply the ordinary rules of contract interpretation. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' [Citations.]" (*Santisas*, *supra*, 17 Cal.4th at p. 608.)

In this case, there are two contractual bases for awarding attorney fees to defendants. First, there is the plain language of the promissory notes' attorney fee provision: "Should suit be commenced or an attorney employed *to enforce payment of*

32

*this note*, the undersigned agrees to pay such additional sum as the court may adjudge reasonable attorney's fees in said suit." Defendants' defense in this case falls with the terms of this attorney fee provision. In exchange for Joanne's interest in the Arroyo Seco property, Tondre and Yvonne agreed to pay her $70,000 and to consider Joanne's debt under the promissory notes paid. In pursuing their claim, plaintiffs sought to rescind the grant deed and unwind the transaction, not only by challenging the July 26, 2011 transaction, but also by challenging the validity of the notes themselves. Thus, defendants' defense of the 2011 property transfer, in sum and substance, was an action to *enforce payment* of the promissory notes.

Second, under the 2007 deed of trust, Joanne agreed "[t]o appear and defend any action or proceeding purporting to affect the security hereof or the right and powers of Beneficiary or Trustee . . . and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in *any action or proceeding* in which Beneficiary or Trustee may appear . . . ." (Italics added.) This attorney fee provision is far broader than the one contained in the promissory notes, as it applied to *any action* in which the trustee or beneficiary may appear. Because the underlying dispute required defendants to appear in an action to enforce their rights under the deed of trust, defendants were entitled to attorney fees under the 2007 deed of trust's broad provisions.

In sum, under Code of Civil Procedure section 1021, the parties were entitled to enter into a fee arrangement that obliged Joanne to pay for attorney fees under these circumstances. (See *Santisas*, *supra*, 17 Cal.4th at 608 ["If a contractual attorney fee provision is phrased broadly enough, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims: '[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.'

33

[Citation.]"].) Here, there were two such provisions, each of which provided a basis for the trial court's attorney fees award.

Plaintiffs challenge the trial court's ruling on a number of fronts. Plaintiffs maintain that it was error to rely on the deed of trust and promissory notes because the documents were never actually litigated at trial. We disagree. "[W]hether a party would have been entitled to attorney fees under a contractual attorney fee provision does not depend on whether that party effectively prosecuted its claim under that contract or whether a jury was asked to reach a verdict on the facts underlying that claim." (See *Mepco Services, Inc. v. Saddleback Valley Unified School Dist.* (2010) 189 Cal.App.4th 1027, 1047 [applying principle to Civil Code section 1717].) Rather, the question is whether the party seeking the attorney fees was the prevailing party in the action. (*Maynard v. BTI Group, Inc.* (2013) 216 Cal.App.4th 984, 990.) Here, defendants were clearly the prevailing party and thus were entitled to seek attorney fees pursuant to the underlying contractual agreement.

Plaintiff also argues that the attorney fees award was erroneous because the litigation was not "on the contract," as required by Civil Code section 1717. As we have noted, in litigation involving a contract, "[Civil Code] section 1717 entitles the successful defendant to recover reasonable attorney fees incurred in defense of that claim if the contract contained a provision for attorney fees." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 877.) "The operative language of [Civil Code] section 1717 states that it applies '[i]n *any action on a contract*, where the contract specifically provides that attorney's fees and costs, which are incurred *to enforce that contract*, shall be awarded either to one of the parties or to the prevailing party . . . .' ([Civ. Code,] § 1717, subd. (a), italics added.) Consistent with this language, this court has held that [Civil Code] section 1717 applies only to actions that contain at least one contract claim. [Citations.] If an action asserts both contract and tort or other noncontract claims, [Civil Code] section 1717 applies only

34

to attorney fees incurred to litigate the contract claims. [Citation.]" (*Santisas*, *supra*, 17 Cal.4th at p. 615.)

Here, we need not address whether or to what extent the litigation concerning the Arroyo Seco property was an action "on a contract" because the attorney fees provisions were enforceable under Code of Civil Procedure section 1021. The primary purpose served by Civil Code section 1717 is to ensure mutuality of remedy, which is not at issue in this case. Because the attorney fees allocation was proper under Code of Civil Procedure section 1021, we need not address whether it was valid under Civil Code section 1717.

Next, plaintiffs argue that an assertion of an affirmative defense does not entitle a party to attorney fees because it is not an " 'action or proceeding,' " which defendants argue is a prerequisite to obtaining attorney fees. The plain language of the operative attorney fees provisions, however, belies this argument. Under the promissory notes, the attorney fees provision is applicable when "an attorney [is] employed to enforce payment of this note . . . ." Under the 2007 deed of trust, the attorney fees provision applies "in any action or proceeding . . . ." Put simply, as a matter of contract interpretation, neither provision can possibly be read to prohibit the recovery of fees when one party raises an affirmative defense and thereafter prevails on that defense.

Finally, plaintiffs maintain that the promissory notes and deed of trust are not binding on any of the parties to this litigation. Plaintiffs argue that defendants were not a party to the promissory notes or deed of trust, and that to the extent Joanne signed the documents, it was in her individual capacity and did not obligate her estate or the Martin Trust. Here, substantial evidence supports the trial court's finding that the Martin estate and the Martin Trust were responsible parties under the attorney fees provision. First, the July 2011 transaction transferring Joanne's interest in the Arroyo Seco property was done by Joanne in her capacity as trustee of the Martin Trust. Second, Berry and Alsberg, as

35

trustees of the Martin Trust, initiated this action to quiet title and rescind the property transfer, and remained parties through its conclusion. Third, in 2006 Martin transferred her interest in the Arroyo Seco property into the Martin Trust. In 2007, she signed a promissory note secured by a deed of trust, which pledged as security real properties that were in the Martin Trust. Joanne could have done this only as trustee. Finally, Joanne was a plaintiff in this case before she died, and Berry was later appointed as special administrator of the Martin estate to pursue this action on behalf of the Martin estate. Thus, the trial court properly found that the Martin estate and Martin Trust were obligated under the attorney fees provisions.

As for defendants, substantial evidence also supports the trial court's finding that they were entitled to collect attorney fees based on the promissory notes and deed of trust. Importantly, there is no language in the provisions that manifests an intent to excluded successors in interest from the scope of the attorney fees provision. Defendants in this action are the successors in interest of the Alarids. Indeed, there seems to be no meaningful dispute on this point. Plaintiffs filed this action against defendants because they were successors in interest to Tondre and Yvonne's interest in the Arroyo Seco property. *Now*, after defendants prevailed, plaintiffs seem to suggest that defendants were not entitled to pursue their rights related to the Arroyo Seco property. We find this argument to be unconvincing.

III.    DISPOSITION

The judgments are affirmed.

36

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

WILSON, J.


*Cook et al. v. Trebino et al.*
H047830
H048498